MARJORIE TWISS, APPELLEE, V. LINCOLN TELEPHONE & TELEGRAPH COMPANY, APPELLANT.

287 N. W. 620

FILED SEPTEMBER 22, 1939. No. 30546.

*Woods, Aitken & Aitken,* for appellant.

*Waldron & Newkirk, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and JOHNSEN, JJ.

ROSE, J.

Plaintiff, Marjorie Twiss, an employee of the Lincoln Telephone & Telegraph Company, defendant, demanded in her petition pension benefits under the latter's pension plan and recovered in her action therefor a judgment for $1,272.95.

On appeal defendant insists the trial court erred in overruling motions to direct a verdict in its favor.

Plaintiff contends that defendant's pension plan constitutes a binding contract between employer and employee; that the evidence supports the verdict on the issue that plaintiff was wrongfully discharged and that her vested pension rights were then $1,272.95.

Defendant issued a 23-page pamphlet, effective January 1, 1917, entitled "Plan for Employees' Pensions, Disability Benefits and Death Benefits." The plan is described in the pamphlet. Plaintiff makes no claim for disability or death benefits. The redress sought by her in this cause of action is limited to pension benefits which depend on the plan and terms described in the pamphlet. . The trust fund for the payment of pensions is created solely by defendant. Plaintiff contributed nothing thereto. Nothing was taken from her compensation to augment the trust fund. She was employed by defendant for telephone service at Louisville, August 1, 1917, and in some capacity was continuously an employee there until she was discharged by defendant July 19, 1935, at the age of 38 years, after approximately 18 years of service. At first she was switch-board telephone operator at $32.50 a month. In 1920, she became manager and chief operator at defendant's Louisville exchange at $70 a month.

Her salary was later increased to $80 a month. In 1930 she was relieved of her duties as manager but continued for a time to received $80 a month as chief operator. In February, 1934, she was demoted to night operator and her salary was reduced to $55 a month. There is no complaint that these monthly salaries were not regularly paid.

When plaintiff was employed in 1917, an officer of defendant explained to her the pension plan described in the pamphlet and she understood the terms on which pensions were to be granted.

Under section 4 of the pension plan plaintiff, after 20 or more years of service, having reached the age of 55 years, would have a right to a pension of $30 a month for life. Her position is that she entered the service of defendant and continued therein, relying on her vested pension rights under her contract of employment, until she was wrongfully discharged July 19, 1935, and that she is entitled to the present worth of her pension benefits for the entire 18-year period of her service, which an actuary figured at $1,272.95, the amount of the verdict on this claim.

The pamphlet states the terms and condition under which an employee of defendant may qualify for a pension. Section 4 thereof, in paragraphs "1 (a) and 1 (b)," provides:

"(1) On and after the effective date of this plan:

"(a) All male employees who have reached the age of sixty years and whose term of employment has been twenty or more years and all female employees who have reached the age of fifty-five years and whose term of employment has been twenty or more years may, at their own request, or at the discretion of the committee, be retired from active service and become eligible to pensions, which pensions are designated 'service pensions.'

"(b) Any employee whose term of employment has been thirty years or more, or any male employee who has reached the age of fifty-five and whose term of employment has been twenty-five or more years, or any female employee who has reached the age of fifty years and whose term of employment has been twenty-five or more years, at the discretion

of the committee and with the approval of the president or of a vice-president designated by the president, be retired from active service and granted a pension, which pension is also designated a 'service pension.' "

Section 8 of the pamphlet, under "General Provisions," referring to section 4, paragraphs "1 (a) and 1 (b)" thereof, is as follows:

" (1) Neither the action of the board of directors in establishing this plan for employees' pensions, disability benefits and death benefits, nor any action hereafter taken by the board or the committee shall be construed as giving to any officer, agent or employee a right to be retained in the service of the company or any right to claim to any pension or other benefit or allowance after discharge from the service of the company, unless the right to such pension or benefit has accrued prior to such discharge. No employee shall have any right to a service pension by reason of service less than that specified in paragraph 1 (a) and 1 (b) of section 4 of these regulations, nor shall any employee have any right in the pension fund unless a service pension authorized by the committee under the plan has not been paid. No employee shall have any right against the company to any benefit under the plan except for the amount to which the employee has theretofore become entitled and which the committee has directed be paid to that employee under the plan."

Under plan and conditions needing no interpretation, plaintiff did not qualify for a pension. Her term of service was not 20 years and she had not reached the age of 55 years. "No employee shall have any right to a service pension by reason of service less than that specified in paragraph 1 (a) and 1 (b) of section 4 of these regulations," says the pamphlet. If plaintiff, as she contends, has a vested right to pension benefits from the time she was employed to the end of her service, those rights would be uneffected by her discharge. There is no right to a pension after the discharge of an employee, unless it previously accrued. Defendant provided the trust fund for pensions voluntarily

and gratuitously and was at liberty to prescribe the conditions on which they are granted. The trust fund contributed alone by defendant for pensions is protected by the provision that an employee can acquire no right to a pension for a term of service shorter than that specified in the plan. The trust fund for pensions is also protected by the provision that the plan confers on an employee no right to remain in the service of defendant or any right to a pension after discharge, unless the right to a pension previously accrued. The allowance of plaintiff's claim for a shorter period than that specified in the plan would, to that extent, divert the trust fund from the purposes for which it was created and impair the rights of employees legally qualified for pensions under the plan adopted by defendant.

Decisions of courts are not in point in cases where employee contributed part of the trust fund for pensions, where the employee had been qualified by service and age, and where bonuses became part of the compensation of employee. On the issue of pension benefits defendant states its position as follows:

"Under a pension plan where the pension fund is accumulated solely through contributions from the employer and the plan provides that no employee shall have any right to a pension for service less than that specifically set out in the plan, and further that the establishment of the plan shall not give any employee a right to be retained in the service of the employer or any right to a pension after discharge, unless the right to a pension has accrued prior to such discharge, an employee who is discharged before having been employed a sufficient length of time to qualify under the plan has no rights or claims in or to the pension fund." Citing: *Wallace v. Northern Ohio Traction & Light Co.*, 57 Ohio App. 203, 13 N. E. (2d) 139; *Magnolia Petroleum Co. v. Butler*, 86 S. W. (2d) (Tex. Civ. App.) 258; *Burgess v. First Nat. Bank*, 219 App. Div. 361, 220 N. Y. Supp. 134; *Dolge v. Dolge*, 70 App. Div. 517, 75 N. Y. Supp. 386; *McNevin v. Solvay Process Co.*, 32 App. Div. 610, 53 N. Y. Supp. 98; *Texas & N. O. R. Co. v. Jones*, 103 S. W. (2d)

(Tex. Civ. App.) 1043; *Fickling v. Pollard,* 51 Ga. App. 54, 179 S. E. 582. Also, dissenting opinion in *Psutka v. Michigan Alkali Co.,* 274 Mich. 318, 264 N. W. 385.

This is the only tenable view of defendant's pension plan considered as a whole. Plaintiff did not make a case for pension benefits in any amount. The trial court erred in overruling the motions to direct a verdict in favor of defendant on that issue. The judgment for pension benefits is therefore reversed and the action therefor dismissed.

Plaintiff in her petition alleged also that defendant slandered her in the telephone exchange at Louisville July 19, 1935, and claimed resulting damages in the sum of $25,000. Upon the trial there was a verdict in her favor for $5,000 and from a judgment therefor defendant appealed.

The alleged slanders were pleaded in the following form:

"That on or about the 19th day of July, 1935, the defendant by and through its officer and servant, one John A. McKinzie, in the city of Louisville, Nebraska, in the hearing of sundry persons, of and concerning the plaintiff, said in substance that plaintiff 'had been having beer parties with men in the office' and that plaintiff 'asked a traveling man from Kansas City to stay all night with her,' thereby meaning and conveying the idea that plaintiff had violated rules of her employer, the defendant, while on duty as a telephone operator, had neglected her duties as such operator and was unfit for such duty, that she was a woman of lewd and immoral character, a prostitute and unfit to remain in the employ of the defendant."

It was further alleged that such statements were false and slanderous and were uttered and published maliciously for the purpose of injuring and damaging plaintiff in her good name and in her business standing and reputation.

Plaintiff's version of what occurred July 19, 1935, in connection with the slanders charged, as disclosed by her testimony on the witness-stand, may be summarized as follows:

As night operator she went off duty on the morning of July 19, 1935, at 7 o'clock and left the exchange for home. When asleep, about 11:00 a. m., her mother called her to

answer the telephone. John A. McKinzie was talking. "He told me that he wanted to see me," she said, "and asked me if I would come down to the telephone exchange and talk with him." One o'clock was fixed as the time for her to appear and she reported at that hour. In the exchange building there were the lobby, the operating room, the rest room and the furnace room. She described the general arrangement of the rooms, the partitions, the doors and the furniture. She entered the lobby, went into the operating room and from there to the rest room, where McKinzie was sitting in a rocking chair, the only person in the room when she entered. He said, "Be seated," and she seated herself on a davenport. He continued: "You have been working about a year of nights now, haven't you?" She answered: "Yes; I have." To this question, "How are you getting along?" she replied, "All right." He then charged: "Miss Twiss, you asked a traveling salesman from Kansas City to stay all night here at the office with you, and he told you that he couldn't, that his wife was with him?" After her denial, he continued: "I know better. You did, and I am releasing you. * * * You have had beer parties also in the office." This, she also denied and testified that McKinzie left the rest room, went into the operating room and in a short time came back with two of the operators—Miriam Carter and Clara Thornton. McKinzie then inquired of Miss Carter: "Were you in the office with Miss Twiss and Don Cramer on a beer party?" She replied: "Yes; I was." This was denounced by plaintiff as a lie. Miss Carter was then asked, "Where did they get the beer?" She answered, "Don Cramer got it." Plaintiff retorted: "That is not the truth." McKinzie said, "That is all then," and the two operators left the rest room and plaintiff went home.

This is a brief outline of the time, place and story of the alleged slanders as told by plaintiff herself.

McKinzie testified in substance that he went to Louisville in the usual course of his corporate duties in the forenoon of July 19, 1935; that R. M. Misner was area manager for defendant; that he had charge of the Louisville office;

that it was the practice to talk with him before discharging an employee; that these two officers of defendant were together in the implement store of C. J. Pankonin, a block north of the exchange, and from him heard what the Kansas City salesman had said about plaintiff; that McKinzie heard this report the same forenoon, July 19, 1935, and also heard at the exchange on that date, before calling plaintiff by telephone, the report that, at the window of the exchange, she had encouraged subscribers to discontinue their telephones. Referring to the meeting in the rest room McKinzie was asked what he said to plaintiff and what she said and he testified as follows:

"I told her that I had called her down because I wanted to talk to her further about the trouble we had been having and I recited some of the things that I had told her before and I said, 'The thing that I heard to-day that I feel is the climax,' and that was the fact that she would stand up to the window and tell subscribers that would come in to pay their bills that if 'I had no more use for a telephone than you have I would have it taken out. In fact, I would have my own taken out if I didn't work here.' And I said, 'Now you realize how hard we have all been working to keep telephones and to have you stand up and tell people those things' was just a little bit more than I was going to stand for and she denied that she had ever said anything like that. And then I told her another matter that had come to my attention after I had reached Louisville, of the rumor that I had received in regard to a conversation that she had had. I asked her, 'Do you recall having a conversation with a salesman a few nights ago, inviting him over to the telephone building to spend the evening with you?' And she denied it. I said, 'You don't recall having such a conversation?' She said, 'No.' I then called in Miss Carter and Miss Thornton and had them relate before her and Mr. Misner what they had previously told about her conversations at the window with subscribers." Plaintiff denied any such conduct on her part.

Defendant is a public service corporation and is conduct-

ing a telephone business at Louisville where telephone communications pass through the exchange night and day. McKinzie and Misner were corporate officers having jurisdiction over the company's employees there. Plaintiff was one of them. In this relation McKinzie and Misner spoke and acted for the corporation which could function only through agents. They had a right to communicate directly with plaintiff in regard to the rumors concerning her conduct as an employee. Their duties required them to do so. Plaintiff and defendant were both interested. Her position as night operator and defendant's management of its own business were involved. Plaintiff's own testimony shows that she and McKinzie were alone in the rest room when he spoke of her rumored invitation to the traveling man. Misner was not then in the rest room. The communication to plaintiff alone was not a publication in the law of slander. 36 C. J. 1223. Each of three employees in the operating room testified she did not hear the charge of immorality until after plaintiff brought this suit.

There is no evidence that defendant published the alleged slander charging immorality. Leona Wallace, a dressmaker employed by plaintiff, testified that she sat in the lobby of the exchange after plaintiff went into the rest room and heard a man's voice and he said: "Miss Twiss, you asked a traveling man from Kansas City to stay all night with you and he wouldn't stay because he said he had his wife with him." McKinzie had taken the precaution to be alone when plaintiff came into the rest room. Her own testimony so shows. He had telephoned for plaintiff, but did not invite Leona Wallace to the exchange. She had no business to transact there or other connection with defendant. She was brought there by plaintiff herself and under the circumstances publication through her was publication by plaintiff, not by defendant. A text-writer states the law as follows:

"If the only publication proved at the trial be one brought about by the plaintiff's own contrivance, this is no sufficient evidence of publication; it is as though the only publication

were to the plaintiff himself, and therefore he must be non-suited." Newell, Slander and Libel (4th ed.) sec. 427.

As to the accusations of immorality, there was no evidence of publication by defendant, and the trial court erred in submitting that issue to the jury. For the error in that particular the judgment for slander is reversed and the cause remanded for further proceedings.

REVERSED.